Steven T. Lowe SBN 122208
 steven@lowelaw.com
Aleksandra Hilvert SBN 258463
 aleksandra@lowelaw.com
Victoria Mulvey SBN 343220
 tori@lowelaw.com
**LOWE & ASSOCIATES, P.C.**
8383 Wilshire Blvd., Suite 1038
Beverly Hills, CA 90211
Telephone: (310) 477-5811

Attorneys for Plaintiff,
**WILLIAM COLLIER**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **WILLIAM COLLIER**, an Individual, <br><br> Plaintiff, <br> v. <br><br> **ADAM MCKAY**, an Individual; **NETFLIX**, a Delaware corporation, **DAVID SIROTA**, an Individual; **HYPEROBJECT INDUSTRIES**, a Delaware limited liability company; **BLUEGRASS FILMS**, a Delaware limited liability company; and DOES 1-50, inclusive; <br><br> Defendants. | CASE NO. <br><br> **COMPLAINT FOR:** <br><br> 1. **COPYRIGHT INFRINGEMENT (FILM); AND** <br> 2. **BREACH OF IMPLIED-IN-FACT AGREEMENT** <br><br> **DEMAND FOR JURY TRIAL** |

## **PARTIES**

1.     At all times herein relevant, Plaintiff WILLIAM COLLIER ("Plaintiff" or "Collier") was and is an individual residing in Lafayette Parish, Louisiana, and the sole author of a wholly original novel entitled "*Stanley's Comet.*"

2.     At all times herein relevant, Defendant Adam McKay ("Defendant McKay") was and is an individual residing in Los Angeles County, California.

3.     At all times herein relevant, Defendant David Sirota ("Defendant Sirota") was and is an individual residing in Denver, Colorado.

4.     Defendant Netflix ("Netflix") is, and at all times herein relevant was a Delaware corporation with its primary place of business in Los Angeles County, California.

5.     Defendant Hyperobject Industries ("Hyperobject Industries") is, and at all times herein relevant was a Delaware limited liability company with its primary place of business in Los Angeles County, California.

6.     Defendant Bluegrass Films LLC ("Bluegrass Films") is, and at all times herein relevant was a Delaware limited liability company with its primary place of business in Los Angeles County, California.

7.     Plaintiff is unaware of the true names and capacities of the Defendants sued herein as DOES 1 through 50, inclusive, and for that reason, sues such Defendants under such fictitious names. Plaintiff is informed, believes, and thereon alleges that such fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages, as herein alleged, were proximately caused by the conduct of said Defendants. Plaintiff will seek to amend the complaint when the names and capacities of such fictitiously named Defendants are ascertained. As alleged herein, "Defendants" shall mean all named Defendants, and all fictitiously named Defendants.

8.     Plaintiff is informed, believes, and thereon alleges that Defendants at all times relevant to this action were the agents, servants, partners, joint venturers, and

employees of each of the other Defendants and in doing the acts alleged herein were acting with the knowledge and consent of each of the other Defendants in this action. Alternatively, at all times herein relevant, each Defendant conspired with each other to commit the wrongful acts complained of herein. Although not all of the Defendants committed all of the acts of the conspiracy or were members of the conspiracy at all times during its existence, each Defendant knowingly performed one or more acts in direct furtherance of the objectives of the conspiracy. Therefore, each Defendant is liable for the acts of all the other conspirators.

## JURISDICTION AND VENUE

1.     This action arises under the Copyright Laws of the United States (Title 17 U.S.C. §101 *et seq*.) and the common law of the State of California.

2.     This Court has exclusive jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 in that this action involves claims arising under the Copyright Laws of the United States. To the extent that this action is based on related state claims, the Court has supplemental jurisdiction thereto under 28 U.S.C §1367.

3.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400 in that Defendants transact business in the county of Los Angeles, California.

## FACTUAL STATEMENT

4.     Plaintiff repeats, alleges and incorporates, by reference, the above paragraphs as though fully set forth herein.

5.     In or about 2004, Plaintiff authored the wholly original novel entitled *Stanley's Comet* ("the Novel" or "*Stanley's Comet*").  Thereafter, Plaintiff registered the Novel with the U.S. Copyright Office, Registration No. TX0009192359 (a true and accurate copy of the same is attached hereto as **Exhibit A**).   The Novel took Plaintiff approximately six (6) months to write.  *STANLEY'S COMET* is a dark comedy focusing on the discovery by a low-level NASA scientist, Dr. Hershel Stanley, of a giant comet on a collision course with the Earth. Initially, NASA, other government agencies, and

even the President, dispute whether the comet will strike the planet. As the catastrophe grows imminent, however, the President announces a planned multi-missile nuclear strike on the comet, which, for political reasons, is eventually aborted. In the meantime, the eccentric, reclusive Dr. Stanley is thrust into the spotlight and enjoys sudden celebrity status. He even has a brief affair with a starlet.

6.     Plaintiff is the owner of all copyright rights in and to the original creative work, *Stanley's Comet*, in all its advancing, original, unique, and protected permutations, and has never assigned, licensed, or otherwise transferred its copyright protection to any of the Defendants, nor to any third party.

7.     In 2007, Plaintiff's daughter, Adrienne Collier Florence (now Metz) ("Metz"), was working for Jimmy Miller Entertainment ("JME") which was a division of Mosaic Media Group Inc. (collectively, JME and Mosaic are referred to as "Mosaic"). Upon information and belief, both JME and Mosaic were owned/co-owned by Jimmy Miller ("Miller").  Mosaic was a talent management and production company which had three (3) divisions – Atlas Media, Dick Clark Productions and Jimmy Miller Entertainment.   Upon information and belief, Metz worked as the Executive Assistant to Michael Aguilar, who at the time was the President of the Production Division of Jimmy Miller Entertainment ("Aguilar").  At all relevant times, JME had a total of approximately 40 employees – of which 12 were in the production division, where Metz worked.  During her employment at JME, the main activity performed by the producers at JME was reviewing and discussing commercially viable entertainment projects, including scripts/screenplays and other intellectual property.  The staff would meet during office hours and even during "community lunches" (which were provided by Mosaic for free in the communal kitchen at the Mosaic offices on a daily basis).  By all indications, the JME team (and for that matter, the Mosaic team) was an extremely close-knit group.

8.     Aguilar reported directly to Jimmy Miller ("Miller") at all relevant times herein and collaborated with Miller and his clients in the development of film and other projects.

9.     JME (and specifically Jimmy Miller) was not only McKay's manager in the entertainment industry, but Miller and Defendant McKay, and their respective companies are well-known collaborators in the production of entertainment projects, including firm projects.  At the time Metz began working for Miller's company, Miller and McKay had just completed Talladega Nights (2006) and were in the pre-production phase of the comedies Stepbrothers (2008) and Land of the Lost (2009).  Throughout this time, Miller served as McKay's Manager and Co-Producer and, in such capacity, invited, received, collected, cataloged, reviewed, and distributed to his client literary works with potential for movie exploitation. Miller also served as a Co-Producer on many of McKay's movies.

10.     As talent managers, Mosaic read and evaluated literary submissions. The majority of the reviewed materials were screenplays, but company personnel also read and reviewed novels, short stories, pitch sheets and other literary works. Submissions were received, cataloged, subjected to a review process, and ultimately retained in a substantial library within the office.  There was a process by which literary works were evaluated and distributed both within the company and to third parties, including clients of Mosaic; Metz was very familiar with the process by which written works were submitted to the company for consideration and formally initiated that process with Mosaic, as more fully set forth hereinbelow.

11.     Plaintiff is informed, believes, and thereon alleges that in 2007, when Metz worked at the Mosaic offices, all submissions were printed and distributed as hard copies and circulated within the office and/or, where directed, delivered by employees of Mosaic (usually via courier) to clients, associates, and partners of Mosaic.

12.     On or about Thursday, July 19, 2007, Plaintiff sent a Word document copy of *Stanley's Comet* to Metz via e-mail. Metz was at work at the Mosaic offices at that

time. Plaintiff sent the copy of Stanley's Comet to Metz at her request, with the understanding that she would submit the novel to Mosaic for consideration.  The purpose of said submission, which was understood by Plaintiff and Metz and others (on behalf of Mosaic), was for (a) Mosaic to represent Plaintiff to procure the "sale" or other exploitation of the Novel; and/or (b) to "sell" (or otherwise exploit) the Novel via a Mosaic client.

13.  Plaintiff is informed, believes, and thereon alleges that his Novel was indeed reviewed and processed in the same manner as any other solicited/voluntarily received literary work and that it was reviewed and considered by multiple producers/managers/employees and even clients of Mosaic, including one or more of the following: Jimmy Miller, Joshua Church, Bill Savage, George Gatins, Joshua Friedman, John Elliot, Nick Miller, M. Riley, Christy Smith and Michael Aguilar.  Upon information and belief, Joshua Church was Miller's protégé and is also credited (with Jimmy Miller) as co-producer on *Stepbrothers* (which was an Adam McKay film). The Novel was also filed in the Mosaic Office Script Library by Bryant Dillon and/or Tony Newsom, who at the time oversaw the library and the collection and distribution of copied materials.  Upon information and belief, the Novel was also reviewed, received and considered by Mosaic's client, Adam McKay, via Jimmy Miller and/or Joshua Church (and/or one of the other producers/managers identified hereinabove).

14.  As McKay's management company, Mosaic had the obligation to present potential projects to McKay for his review and consideration.  As such, there was a common subject matter between Mosaic and McKay – specifically, projects in the entertainment industry that are commercially viable.

15.  The Novel was voluntarily accepted by Mosaic as manager/producing partner of McKay and specifically by Jimmy Miller and the other persons identified hereinabove.  Defendants had the opportunity to reject the submission of Plaintiff's Novel before the submission. Since *Stanley's Comet* was received by McKay's manager, custom and practice in the entertainment industry dictates that this constitutes receipt by

McKay (i.e., it is imputed to McKay).  Furthermore, upon information and belief, the Novel was transmitted via courier, email or hand-delivery (or via other means) to McKay himself.

16.    Plaintiff is informed and believes and thereon alleges that Miller served as Defendant McKay's Manager during all relevant times and until 2015. In the entertainment industry, managers, such as Miller, are instrumental in finding, procuring, and submitting intellectual property to their clients, for their review and possible exploitation.  For example, McKay, a screenwriter and director, would likely want to consider the novel to write and direct an adaptation thereof.

17.    Plaintiff is informed, believes, and thereon alleges that Defendant McKay, as a client of Miller, did receive many submissions of screenplays, novels and manuscripts from the Mosaic offices – including *Stanley's Comet*.

18.    Plaintiff is informed and believes and thereon alleges that based upon custom and practice in the entertainment industry and the prior dealings between Mosaic and McKay, that Mosaic and McKay knew Plaintiff's submission was not gratuitous and was made for the purpose of exploiting the Novel.

19.    Plaintiff later self-published *Stanley's Comet* in 2012 in his book, *In Extremis, Two Novels*. These novels have been available for purchase from major retailers including Amazon and Barnes and Nobles since that time and remain available for purchase to date.

### Netflix Releases "Don't Look Up"

20.    On December 10, 2021, the film *Don't Look Up* (hereinafter "the Film") had a limited theatrical release.  It began streaming on Netflix on December 24, 2021. Defendant McKay allegedly wrote the Screenplay for the Film in 2019.  The Film is strikingly similar to *Stanley's Comet* and contains the same copyrightable expression as *Stanley's Comet,* including the selection and arrangement of both protected and unprotected elements.

21.     *Don't Look Up* has enjoyed great success, including top ratings on Rotten Tomatoes and IMDB, nomination for four (4) Academy Awards, and the "Best Original Screenplay" award from the Writers Guild of America. It is the second most-watched film on Netflix and is rated in the top three (3) international movies in 2022.

22.     McKay is credited as the sole screenwriter and director of *Don't Look Up*.

23.     McKay and journalist David Sirota ("Sirota") are both credited with "Story By" credits for the Film.  This is the first "Story By" credit Defendant Sirota has received.

24.     Plaintiff is informed and believes and thereon alleges that Mosaic transmitted the *Stanley's Comet* Novel to McKay via McKay's then Manager, Jimmy Miller.

25.     Upon information and belief, Defendants Hyperobject Industries and Bluegrass Films are entities owned and controlled by McKay and are credited as producers of *Don't Look Up* and thereby performed functions in connection with *Don't Look Up* which violate §106 of the Copyright Act (i.e., producing the infringing film). Netflix claims to own the copyright to *Don't Look Up* and served as the Film's "distributor".  Upon information and belief, Netflix was assigned the copyright from Defendant McKay via copyright assignment.

## Substantial Similarities

26.     Just like the Novel, the Film is a dark comedy about a giant comet on a collision course with the Earth.  The similarities between the Novel and the Film are readily apparent across all necessary categories of mood, tone, pace, sequence of events, themes, plot, character and setting (which are further explored hereinbelow). Yet the most striking similarity of all is the way in which both works put a fresh spin on the "apocalyptic genre".

27.     The most appealing element about the Novel was that it turned the apocalyptic "end of earth" genre on its head by introducing several key elements in new

and unique ways (among other things.)  Expressing the idea of the world coming to an end in this Novel way was key to the Novel and is similarly key to the Film.

28.    This is further explained in the report of USC Professor David Román, whom Plaintiff has retained in connection with this matter. Prof. Román is a tenured professor of comparative literature at the University of Southern California.  Professor Román holds a Ph.D. and a Master of Arts in Comparative Literature from the University of Wisconsin at Madison and is the author of several award-winning books on twentieth and twenty-first-century American literature and culture. Before teaching at USC, Professor taught at the University of Washington and Yale University. A true and accurate copy of Professor Román's *curriculum vitae* is attached hereto as **Exhibit B.** He is a previously court-qualified expert in the field of comparisons of literary works.

29.    In his report, Prof. Román opined as follows:

> "Generally, this kind of story can be understood within the genre of the "disaster" plot, where something catastrophic threatens the survival of the world. These stories, which are by nature suspenseful, generally promote a sense of hysteria among the characters …while coming out of this tradition, *Stanley's Comet* comes out of this and brilliantly refutes the emotional register of the disaster plot. In *Stanley's Comet* few seem to care about the planet's impending demise. And it's not as if no one knows about it....[t]he tone of the novel is neither tragic nor sensational. Instead, the novel is satiric, parodic, and full of irony. The casualness in which the comet's arrival is perceived defies the logic of the comet's astronomical power."

So, too, is this found in the Film which borrows heavily from that remarkable departure. In fact, Professor Román goes on to say:

> "The movie, like the novel, makes a strong political critique of the media, the government, and the cultural elite by showcasing their shallowness and reliance on popular opinion polls and social media algorithms. McKay's film is also full of satire and humor and--like *Stanley's Comet*--moves toward the absurd. In each case, the irony drives the humor and the social critique and does so in the same style and method."

An analysis of the other relevant categories evidencing substantial, if not striking, similarity are found herein below:

30.   **Mood/Tone**

    a)    Comedic suspense

    b)    Political satire

    c)    Dark Comedy

31.   **Pace**

The pace of both works is generated by the comet advancing toward the Earth and the pressure that builds as it closes in. In the beginning, both works focus on the discovery of the comet and communicate that it is going to destroy the earth in a short period of time and nobody cares about it except a few characters. Thereafter, in both works, the scientists attempt to convince politicians and the public that the comet is a real danger to humanity yet society remains unbothered and more focused on the trivial aspects of daily life than on the end of civilization as we know it. As both stories reach their climax, people are now able to see the comet both literally and figuratively for what it represents. As time goes on, there is a split between people who believe in its destructive nature and those who don't believe (which is the message being proffered by the government in both works). At the end of both works, the comet reaches the Earth's orbit and life as we know it is demolished in one work (the Film) and severely threatened in the other (the Novel).

32.   **Sequence of Events**

    a)    Both works begin with a discovery of a comet by a low-level astronomer/scientist

    b)    Both works feature a countdown to comet using calendar time

    c)    In both works, the cultural indifference to the comet is immediate

d)   Sunday morning "soft news" show where anchors congratulate them on their exciting new discovery and having the comets named after them

e)   In both works the morning talk show is the primary means for alerting the public about the comet hurtling towards Earth

f)   In both works the scientists go on a whirlwind media tour

g)   The discovering scientists both have flings with high profile people

h)   Other countries doubt the findings/veracity of the statement about pending doom

i)   As time goes on a "shoot the messenger" mentality arises – we see the scientists abducted/taken by FBI/Angry mobs

j)   Inept Presidents focused on political power and downplay danger of the comet

k)   Powerful people minimizing the astronomer's credibility, calling him a field mouse/malcontent nobody/lower rung astronomer

l)   Government attempts to use nuclear weapons to destroy the comet

m)   Government's pre-emptive strikes of comet path aborted for political reason

n)   Bar Scenes where every day people talk about the impending comet

o)   Grocery stores ravaged

p)   Burned Cars / Looting / Riots as people start to sense impending doom

q)   People getting out of their car to look up at the comet in the sky

r)   The phrase "Don't Look" or "Don't Look up" in both, conveying the same expressive message of willful ignorance of imminent calamity The comet functions similarly in both and as the story unfolds there is less and less time to deal with the reality of the comets inevitability.

s)   Petty annoyances with the Military General

t)  Discussions about God and impending doom

u)  Presidential agendas for Vitamins for all Kids / Exercise programs for kids

v)  Abandonment by those supposed to be in charge as we see both Presidents abandon their posts after telling the public not to panic they would be okay

33.  **Themes**

a)  Strong political critique of the media, the government, and the cultural elite by showcasing their shallowness and reliance on popular opinion polls and social media algorithms

b)  Critique on politics - Politicians care more about public favor than telling their constituents the truth, and hide dangerous, often important information from the public

c)  Critique on human nature - every man for themselves mentality when there is no government/when everyone thinks they are going to die

d)  Critique on society - have moved away from trusting science to relying more on the opinions of politicians/our own judgment

e)  Mob mentality where unrivaled greed is the most immediate reaction as a critique on capitalism and our dependence on material things

f)  Critique on our obsession with celebrity culture and worship – the scientists became famous and were sought for autographs, magazine covers, air time despite the impending doom

g)  Critique on cultural reliance or distrust of conspiracies such as internet blogs

h)  The comet is seen as a political issue and whether people believe in it or not depends on their distrust/trust of the government

i)   Critique on wealthy and powerful people being able to protect themselves from the danger

j)   Anti-disaster plot - something threatens the survival of the world, but few seem to care about the planet's demise

k)   Willful ignorance – critiquing rejection of science and refusing to take steps to address calamity

///

34.   **Plot**

The plot of both works is practically identical: Low level scientists find a large comet that is headed straight towards earth and is going to destroy the earth and wipe out all humanity in a matter of time. In conveying this message to the public, the scientists go on a morning talk show (which undermines the urgency and nature of the matter) which then causes most people to be unbothered by it. Even the presidents and government leaders downplay the comet's apocalyptic effect.  Eventually, the comet is visible to the citizens of planet Earth and mayhem ensues as the comet is rapidly approaching. *See also*, Sequence of Events.

35.   **Characters**

a)   Both works feature a low-level scientist: Dr. Stanley/Dr. Mindy who are about the same age and have the same personality. The Novel: "An embittered junior grade NASA scientist/astronomer whose accidentally discovery of the comet catapult him from obscurity to momentary notoriety." The Film: "Two low-level astronomers must go on giant media tour to warn mankind of approaching comet that will destroy the earth."

b)   Both works feature acting Presidents who treat the comet as a disputed factual issue. The Novel: "President of US standing behind an Eagle embossed lectern speaking to the crowd of reporters and

photographers ...exuded competence and confidence" discussing Vitamin Supplement plan, reporter asks about comet impact with earth. President responds "no, no, no... completely inaccurate...plan? "my son is something of an amateur astronomer so we plan to set up his telescope. Daily Rip The Film: Mindy explains to President the science and "planet killer," President says "don't say 100 percent, call it 70 percent...can't tell people they are going to die... what's this going to cost me?"

    c)    Both works feature one individual who is more afraid of the comet than anyone else. The Novel: Stanley; The Film: Kate Dibiasky

36.   **Setting**

    a)    White House (Oval Office)

    b)    Astrology/NASA Headquarters

    c)    Military Airplanes

    d)    Television Studio

    e)    Hotel

    f)    City Streets

    g)    Small town/grocery store

    h)    Earth generally (doomed)

37.   **Dialogue**

Scientist repeatedly telling people very straightforwardly that a comet is hurdling towards earth and will kill everyone.  Further, the media repeatedly tells people to make light of the comet.  In both works, it seems like the hosts of the talk show aren't even actually listening to what the scientist is saying (they downplay or try to change the subject).  Furthermore, the phrase "Don't Look Up" or "Don't Look" featured widely in both works.   Finally, both works feature a character saying, "oh sh*t" upon first seeing the comet heading towards earth.

38.    Professor Román further determined that there are enough important similarities between the two works to merit a conclusion that one is substantially similar to the other and otherwise, as set forth in his report attached hereto.  Among other things, Prof. Román identified the following similarities:

a)    The Sequence of Events of the Film tracks the Novel, namely both works are dark comedies centered on the discovery by a low-level NASA astronomer of a giant comet on a collision course with the Earth.  Initially, government agencies and even the President denied the comet will strike.  As the catastrophe grows imminent, however, the President announces a planned multi-missile nuclear strike on the comet, which is eventually aborted for political reasons.  In the meantime, the reclusive astronomer who made the discovery is thrust into the limelight and enjoys sudden celebrity status, including a brief affair with someone in the public eye.

b)    The Film, like the Novel, makes a strong political critique of the media, the government, and the cultural elite by showcasing their shallowness and reliance on popular opinion polls and social media algorithms.

c)    The Film and the Novel share an identical tone. The works are full of satire and humor, moving toward the absurd. In each case, the irony and humor drive the social critique in the same method.

d)    Both works are comedies in which the world depicted, for all its fallibility, is meant to be recognizable as "real."

e)    The comet is not supernatural, and the worlds of the Novel and the Film are not science fiction. In both works, the audience is meant to believe that the world in representation is similar to the one in which they live. The intended effect is that the reader/viewer would most probably respond with more fear and panic than do the characters in

the works if confronted with the reality of a catastrophic, planet-destroying comet hurtling towards Earth.

f)    Eventually, the characters in both the Film and the Novel come to accept the reality of the threat and act accordingly. Both works showcase cultural mayhem as riots and looting result from the news. This mob mentality, where unrivaled greed is the most immediate emotion, is meant as a critique of capitalism. There is little communal support in both works, and everyone is left to fend for themselves.

g)    Both the Film and the Novel serve as a critique of the media and celebrity culture. In both works, the scientists appear on morning talk shows to alert the public of the comet's threat. Similarly, the scientists' warnings are ignored even as they increase their public profiles and become recognizable figures and household names. This theme and plot device also appears in *Don't Look Up* and becomes one of the Film's major sources of humor. The morning talk show is central to the plot and structure of both works.

h)    Both Dr. Stanley Hershel in the Novel and Dr. Randall Mindy in the Film enjoy an astronomical rise to celebrity and have romantic flings with a starlet (Hershel) and the morning talk show host (Mindy).

i)    The two works follow a similar sequence of events, beginning with the morning talk show. In both works, the comet's arrival is announced early on and met with immediate cultural indifference. Further, the countdown to the comet's collision with the earth is measured in calendar time in both works.

39.    Professor Román concluded that the plot, characters, tone, and pacing of *Don't Look Up* were extremely similar to those of *Stanley's Comet*. Indeed, the similarities between the Film and the Novel are so striking that it is highly improbable that the former could have been created independently from the latter.

40. Thus, it is alleged that, in writing the Screenplay for the Film, Defendant McKay intentionally, willfully, and without authorization used and misappropriated the themes, settings, pace, plot, and mood along with many of the same events and characters found in *Stanley's Comet.*

///

**No Independent Creation of the Storyline for "*Don't Look Up*"**

41. Defendant McKay claims to have written the Screenplay for *Don't Look Up* in Ireland in 2019. This was long after the submission of the Novel, *Stanley's Comet,* to McKay's Manager, Miller, in 2007 and the publication of the Novel in 2012.  As such, he admittedly created the Film after he had access to the Novel via his longtime manager Miller.  McKay further claims it only took him three weeks to write completed initial draft of the Screenplay for *Don't Look Up*.   The interview is available at https://www.hollywoodreporter.com/movies/movie-features/making-of-dont-look-up-adam-mckay-1235060315/.

42. Defendant McKay's own alleged sources for inspiration for writing the Film are contradictory.  According to one story McKay has repeated in several interviews, he and journalist, Defendant David Sirota ("Sirota"), were visiting one day in or about 2019, lamenting the public's lack of interest in climate change.  Sirota mused that it was like a comet (or an asteroid or a meteor, depending on the interview) hurtling toward the Earth, but no one seemed to care.  McKay has repeatedly claimed that Sirota's climate change metaphor inspired him to write the movie script.  *See*, e.g. https://www.npr.org/2021/12/18/1065547285/adam-mckay-talks-new-doomsday-satire-movie-dont-look-up.

43. In another interview, however, McKay states he got the idea for the Film in 2019 after "The Uninhabitable Earth" which "depicts the ways in which global warming will wreak havoc on the planet if nothing is done to combat the climate crisis." Of interest, in this article McKay also states that the early drafts of the film were not

comedic at all, stating, "Surprisingly, the first few drafts of '*Don't Look Up*' weren't comedic! I played with the idea at first of making a straightforward drama or a small, intimate character study."  The interview is available at https://meaww.com/dont-look-up-adam-mckay-reveals-inspiration-behind-scifi-comedy-leonardo-dicaprio-jennifer-lawrence.

44.    Further, in yet another interview, it is stated that McKay got the idea for the Film from a comet/climate change metaphor used by Sirota in a newspaper column rather than in a conversation.  This interview is available at

https://www.vanityfair.com/hollywood/2021/11/who-the-fuck-cares-about-adam-mckay.

Either way, there is not a single mention or any reference whatsoever to "climate change" in the Film, and nothing to support his assertion that the climate change metaphor is the central allegory of the Film, other than his own comment that it is.

45.    In interviews, Defendant Sirota more or less supports McKay's independent creation story as outlined above, though he seems surprised by how quickly McKay wrote the Screenplay and perplexed by his attribution as co-author.  In fact, McKay credited Defendant Sirota as the co-author, even though, apparently, Sirota wrote not a single word or contributed anything at all to the writing of the script, other than his off handed climate change comment.

46.    Plaintiff is informed, believes, and thereon alleges that McKay used the "climate change" story to turn Sirota, a respected journalist, into a witness to the actual moment of McKay's claimed "independent creation" of the Film's storyline and then to bind him to the story by crediting him as the co-author of the Screenplay.

47.    Faced with the fact that his Film, *Don't Look Up*, uses the same themes, settings, pace, plot, sequence of events and mood along with many of the same characters and dialogue found in *Stanley's Comet*, a Novel previously submitted to McKay's Manager and to which he had access and actual or imputed possession, McKay concocted this implausible story of his "independent creation" of the storyline, using

Sirota for that purpose.  Accordingly, any claim by McKay of independent creation is implausible.

///
///
///

## FIRST CAUSE OF ACTION
## COPYRIGHT INFRINGEMENT
### (As to All Defendants)

48.    Plaintiff repeats, alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

49.    In December 2021, Netflix released "*Don't Look Up*" to the public, crediting Defendant McKay as the writer and director thereof, and Defendants McKay, Sirota, Bluegrass and Hyperobject as producers thereof.

50.    As alleged hereinabove, the named Defendants have infringed upon Plaintiff's copyright by copying wholly original elements from Plaintiff's novel *Stanley's Comet*, without permission, in *Don't Look Up*.

51.    Plaintiff is informed, believes, and thereon alleges that the named Defendants intentionally broadcast, distributed, published, sold, conveyed, and otherwise exploited *Don't Look Up* without authorization, in violation of Plaintiff's rights.

52.    Plaintiff is informed, believes, and thereon alleges that the named Defendants have intentionally violated the Federal Copyright Act, Title 17 U.S.C. §101 *et seq.*, entitling Plaintiff to all damages and remedies provided by the Act.

53.    Plaintiff is informed, believes, and thereon alleges that the named Defendants continue to infringe upon Plaintiff's copyrights, causing Plaintiff irreparable injury and damage. Said infringement entitles Plaintiff to actual and statutory damages, injunctive, and other relief provided by the Copyright Act.

**SECOND CAUSE OF ACTION**

**BREACH OF IMPLIED-IN-FACT AGREEMENT**

**(As to McKay)**

54.     Plaintiff repeats, alleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

55.     As set forth hereinabove, Plaintiff wrote *Stanley's Comet,* which was disclosed *Stanley's Comet* to McKay's manager/producer/agent under circumstances where Mosaic/JME and by extension, Defendant McKay, voluntarily accepted the disclosure knowing that they had an obligation to compensate and credit Plaintiff in accordance with custom and practice in the entertainment industry in the event Plaintiff's ideas were later used.

56.     By virtue of said acceptance and utilization of Plaintiff's ideas, an agreement was implied-in-fact to pay Plaintiff for the reasonable value of those ideas and to credit Plaintiff as the creator/writer thereof.

57.     Plaintiff performed all covenants and conditions required of him pursuant to said agreement. Defendant McKay breached said agreement by utilizing and profiting from Plaintiff's ideas without compensation or credit to Plaintiff.

58.     *Don't Look Up* utilized Plaintiff's key ideas as contained in his novel *Stanley's Comet*.

59.     As a result of the foregoing, Plaintiff was damaged in an amount according to proof for *Don't Look Up* but no less than $5,000,000.

**PRAYER FOR RELIEF**

**ON ALL CAUSES OF ACTION:**

1.     For a preliminary and permanent injunction enjoining Defendants from infringing the copyrights of Plaintiff in any manner;

2.     For actual damages and profits according to proof;

3.      That Defendants be required to pay to Plaintiff such damages as Plaintiff has sustained in consequence of Defendants' infringements of Plaintiff's copyright and to account for:

    (a)   All gains, profits, and advantages derived by Defendants by his or her infringement of Plaintiff's copyright or such damages as the court shall deem proper within the provisions of the copyright statute, but no less than $5,000,000;

    (b)   That Defendants deliver up to be impounded during the pendency of this action all copies of said infringing work as in its possession or under its control and deliver up for destruction all infringing copies and all plates, molds, or other matter used to make infringing copies.

4.      For statutory damages, and costs with respect to *Don't Look Up* and any other derivative works;

5.      For an accounting;

6.      For costs of suit and interest; and,

7.      For such relief as is just and proper.

Dated: December 4, 2023

                LOWE & ASSOCIATES, P.C.

                _____

                STEVEN T. LOWE, ESQ.
                ALEKSANDRA M. HILVERT, ESQ.
                Attorneys for PLAINTIFF WILLIAM COLLIER

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: December 4, 2023

LOWE & ASSOCIATES, P.C.

_____

STEVEN T. LOWE, ESQ.
ALEKSANDRA M. HILVERT, ESQ.
Attorneys for PLAINTIFF WILLIAM COLLIER